FILED
COURT OF APPEALS
DIVISION II

2014 DEC 10 PM 12: 09

STATE OF WASHINGTON

BY No. _____ 4 II
DEPUTY

# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| ABBIGAIL GUTIERREZ, individually, and NL, a minor, | |
| Respondents, | UNPUBLISHED OPINION |
| v. | |
| OLYMPIA SCHOOL DISTRICT, | |
| Appellant. | |

BJORGEN, A.C.J. — Abbigail Gutierrez, personally and on behalf of her minor daughter, NL, sued the Olympia School District after Gary Shafer, a bus driver employed by the District, sexually abused NL aboard NL's kindergarten bus. A jury found that the District's negligence proximately caused $1,425,000 in damages to NL and Gutierrez. The District appeals the jury's verdict, arguing that the trial court erred by admitting (1) certain evidence concerning the number of times Shafer rode NL's bus; (2) evidence that Shafer had abused other kindergarten girls on District buses and possessed child pornography; and (3) an expert witness's opinion that the District should have taken certain measures that would have prevented the abuse. The District further contends that (4) the remaining properly admitted evidence does not support the jury's verdict. Concluding that any errors did not, within reasonable probabilities, materially affect the verdict, we affirm.

## FACTS

On December 30, 2010, NL disclosed to Gutierrez that "Gary," a "helper on the bus," had touched her inappropriately. Verbatim Report of Proceedings (VRP) at 1063-064. Gutierrez immediately reported the abuse to the Thurston County Sheriff's Office.

Detective Cheryl Stines investigated the report and conducted a one-on-one interview with NL, which was recorded by video. NL stated that she had sat in Shafer's lap on "the second seat" on the school bus and that he had put his hand in her underwear and "tickled [her] private" sometime after Halloween and before Thanksgiving or Christmas of 2010. VRP at 201-04 (transcription of excerpt of the video recording of Stines' interview with NL: Ex. 97, as played to the jury). NL later identified Shafer from a copy of his driver's license photo. Shafer eventually admitted to sexually abusing several girls, including NL, while driving or riding along on District buses. He ultimately pled guilty to three counts of first degree child molestation involving NL, NL's seat mate VV, and another kindergarten girl, and to one count of possession of depictions of a minor engaged in sexually explicit conduct.

Gutierrez filed this lawsuit in her individual capacity and as guardian of NL, alleging that the District had failed (1) to adequately supervise and protect NL, (2) to maintain adequate security on its buses, (3) to properly supervise Shafer, and (4) to properly supervise and train its employees to recognize and prevent sexual abuse of children; and that these omissions proximately caused injuries to NL and Gutierrez. The complaint did not name Shafer or any other individual as a defendant.

A.    Pretrial Motions

The District moved in limine to exclude, among other evidence, the testimony of all expert witnesses retained by Gutierrez except one, Mark Whitehill, Ph.D., on the ground that Gutierrez did not timely disclose the experts' opinions. The District also moved in limine to exclude a psychological evaluation of Shafer performed as part of the presentence investigation,

2

any statements attributed to Shafer, and any reference to Shafer's sexual abuse of other students. The trial court reserved ruling on these motions.

On the first day of trial, the court denied the District's motion to exclude the testimony of Gutierrez's expert witnesses, but granted the District's motion to exclude all evidence concerning statements attributed to Shafer, except for the judgment and sentence in his related criminal case. The court also prohibited Gutierrez's experts from referring to those statements even though the experts had relied on them in reaching their opinions. After balancing the probative value of the evidence against the risk of unfair prejudice under ER 403, the court ruled the judgment and sentence admissible,[1] but excluded the statements attributed to Shafer because they amounted to hearsay and posed too great a risk of unfair prejudice to the District.

The court also denied Gutierrez's later motion to have Shafer transported from prison to testify on the grounds that Gutierrez had not named Shafer as a party or a potential witness and that the risk of unfair prejudice to the District outweighed the probative value.

B.     Evidence of the Frequency and Nature of Shafer's Rides on Kindergarten and Preschool Buses

A significant portion of the trial testimony concerned the District's policy of permitting its bus drivers to ride along unpaid on other drivers' mid-day kindergarten and preschool routes. Fred Stanley, the District's transportation director, testified that he allowed Shafer to ride along on NL's bus because Shafer "was assisting students to remain seated and make sure they got to

---

[1] The judgment and sentence listed Shafer's convictions for molesting NL, VV, and another kindergarten girl, as well as his conviction for possession of depictions of a child engaged in sexually explicit conduct. The trial court performed its balancing test on the judgment and sentence as a whole; it did not separately balance the prejudicial versus probative value of each of these convictions.

their parents on time and learning the bus route so he could drive it more on time when he would sub[stitute]" for the regular driver. VRP at 481-82.

At trial, Mario Paz, the driver regularly assigned to NL's mid-day kindergarten route during the 2010-2011 school year, testified that he had been trained not to allow adults to sit with children on the buses and that the District had a policy prohibiting bus drivers from sitting with children while riding along on buses. Paz testified also that he did not enforce the rule with Shafer because he "trusted [Shafer and] figured he wouldn't do anything to the kids." VRP at 67-68. Paz admitted that he had considered Shafer a friend. Paz also gave conflicting testimony about the District's policy and practice.[2] *Compare, e.g.*, VRP at 61-62 (Paz testified: "We were trained to make sure [adults riding the bus] don't sit with the kids, yes. That's correct.") *and* VRP at 152 (Paz admitted that he stated in his deposition, in his own words, that "[p]olicy states you are not allowed to sit with kids") *with* VRP at 103 (Paz testified: "There's no rule [prohibiting adults from sitting with students]. That's a mistake that I made in my own deposition.").

Paz testified that NL and her friend, VV, sat with Shafer in the seat directly behind the driver, the only seat on the bus outside the field of view of the mirrors the driver used to monitor activity on the bus. Paz admitted that Shafer did not ride the bus in order to learn the route and that Shafer could not have seen where the bus was going from that seat. Paz also admitted that

---

[2] Paz is not a native speaker of English and admitted having difficulty understanding the attorneys' questions. Paz also admitted, however, that counsel for the District had attended his deposition, that they had met prior to the deposition to discuss his testimony, that both he and the District's counsel had read and reviewed his deposition and had an opportunity to make corrections, and that they did not make any changes. Paz claimed that only on the witness stand at trial did he realize that his deposition testimony had "a lot of mistakes." VRP at 143.

Shafer did not ride the bus as a monitor or to help Paz manage students and that Paz found Shafer's conduct "strange." VRP at 86-87. Paz further acknowledged that, the first time Shafer asked to ride along on Paz's bus, he had asked transportation director Stanley's permission, but had "never bothered asking again because Fred Stanley just let [Shafer] ride whenever he wanted." VRP at 69. Paz testified that Shafer rode his bus a maximum of two or three times, that no children rode the bus one of those times, and that Shafer sat with NL and VV only one time for about 20 minutes. However, when asked whether he knew that NL and VV knew Shafer as "Gary," Paz answered, "Yeah. He asked them all the time." VRP at 95.

Contrary to his previous testimony, Paz denied on cross-examination that the transportation department had ever had a rule that adult passengers should not sit with children. Paz also denied that Shafer had said or done anything suspicious. When asked why Shafer wanted to ride the bus, Paz answered, "I can't remember why." VRP at 107. Counsel for the District then asked Paz if "it had anything to do with him learning the route or substituting for you?" VRP at 107. Paz responded that Shafer "wanted just to ride the bus to make sure there [were] no mistakes on the route." VRP at 108.

Several other District bus drivers also testified that Shafer sometimes rode their buses. Driver Dale Thompson testified that Shafer rode along as many as 40 times over 5 years on Thompson's kindergarten route. Driver Thomas Reeves testified that Shafer asked to ride along on Reeves's kindergarten route because "[Shafer] was bored and didn't have anything to do." VRP at 341. Driver Thomas Engle testified that Shafer rode along "a couple of times" and "sat and chatted with kids" when Engle substituted on kindergarten routes. VRP at 367-73. Engle testified that Shafer moved between seats and sat with children during these rides and that he

5

could not recall any other transportation department employee who would move around the bus and sit with kindergarten children while riding along. District driver John Bakewell also testified that Shafer often rode along when Bakewell substituted on kindergarten and preschool routes.

Stanley testified that the transportation department did not keep records of drivers' requests to ride along on mid-day bus routes. Stanley testified that drivers had to obtain his permission before riding along with another driver but that he had no controls in place governing which drivers could ride along on other drivers' routes, that he had never denied any of Shafer's requests to ride along, and that Shafer might have ridden Paz's bus without Stanley's permission.

Stanley also testified that he thought Shafer's trips on NL's bus served an "educational purpose" because Shafer was assisting students and learning the bus route. VRP at 481. When confronted with contrary testimony from his own deposition, however, Stanley admitted that the District had no valid reason for Shafer to have ridden along on Paz's route more than one or two times in the fall of 2010.

After Shafer came under investigation, Stanley distributed a survey to drivers asking if they recalled when Shafer had ridden their buses. Paz and Bakewell did not respond, but five other drivers did. The survey showed that four drivers recalled Shafer riding along on their mid-day kindergarten routes 11 times in the 2010-to-2011 school year. Driver Todd Adams recalled Shafer riding along on NL's bus on two occasions when Adams substituted for Paz in the fall of 2010.

The parties agreed that an edited video recording of Detective Stines' interview with NL would be played for the jury. On the video, in response to Stines' questions, NL related that "Gary," a "grown-up boy" who "[r]ides on the bus," had put his hand in her underwear while she

sat on his lap "one time" on the way to school. VRP at 199-201. NL stated that the abuse occurred after Halloween and before Thanksgiving, then added, "[a]nd before Christmas." VRP at 204. When asked whether Shafer rode the bus every day, NL answered, "[s]ome days," and then clarified that "[s]ome days he's not. Some days there's a different guy. Some days there's no one." VRP at 204.

Over the District's hearsay objection, Stines also testified concerning evidence she obtained from VV, NL's seat mate on the bus. Stines testified that Shafer sat the girls on his lap, tickled them, and told them knock-knock jokes from his cell phone, which Stines characterized as "grooming behavior" designed "[t]o get closer to them." VRP at 217-18. The court admitted into evidence, without objection, a picture Stines obtained that VV had drawn of herself and Shafer; and Stines testified that VV had hoped to take the picture to school to show her class her "friend Gary." VRP at 219. Stines stated that, according to her investigation, the relationship between Shafer and the girls developed through "[m]ore than one" interaction occurring on "multiple days." VRP at 222.

Stines also testified that she had "received some information that there were possibly additional victims" and was able to identify one whom Shafer also pled guilty to molesting. VRP at 226. Over the District's renewed objection, the trial court then admitted Shafer's judgment and sentence.

NL's teacher, Melanie Evans, testified that she had observed NL's bus arrive at the school "[o]ccasionally" or "[m]aybe 75 percent of the time" in the fall of 2010 and that "occasionally a few times" she noticed another adult riding along. VRP at 416-17. The principal of NL's school, Alice Drummer, testified that she had asked whether Evans had seen a man

riding along on NL's bus, that Evans had responded that she had seen "someone on there [this] November and December," and that the conversation had ended there. VRP at 446. Gutierrez then introduced Drummer's deposition testimony, in which Drummer, when asked whether Evans had "confirmed that she felt it was also very unusual that there would be another man riding along on that bus," responded, "[c]orrect," and stated that Drummer herself also thought it unusual. VRP at 447. Evans testified that this conversation with Drummer had never taken place at all.

Gutierrez testified without objection that, in the weeks following NL's interview with Stines, NL sometimes brought Shafer up, asking, for example, whether Shafer would go to jail. Gutierrez also testified that they prayed for Shafer, at NL's request, every night for "about a two-week period" because NL "felt bad for [Shafer's] wife and she felt bad for her friend that she had to tell on him [and] that he was going to jail so she wanted him to be safe." VRP at 1072. Gutierrez then testified, over the District's hearsay objection, about a conversation she had with NL in which NL said that Shafer "always rode the bus" and clarified that he rode the bus "[a]bout two times a week for a while." VRP at 1073-074.

C.    Other Evidence That the District Should Have Known That Shafer Might Pose a Risk to Students

Kevin Gearhart testified that on October 19, 2009, his daughter, the last student to get off her kindergarten bus after school, arrived home more than 30 minutes late. Gearhart testified that his daughter was "not her chipper self" when she got off the bus, and told him later that evening that she would not ride the bus to school anymore, but refused to say why not. VRP at 753-54. According to Gearhart, he spoke to various district employees, including Stanley's training coordinator Barbara Greer, but never got a satisfactory explanation.

Gearhart testified that, when Shafer's arrest appeared in the news, his wife immediately recognized Shafer as the man driving the bus the day their daughter told them she would not ride the bus again. Gearhart eventually learned that Shafer had substituted for the regular driver on October 19, 2009, and the court admitted a record Gutierrez had obtained from the District confirming that Shafer had substituted on Gearhart's daughter's route that day.

D.   Evidence That the District Did Not Properly Train Staff and Drivers About the Known Risk of Sexual Abuse of Students

Trial testimony on the District's policies and training concerning sexual abuse of students by school employees focused on two elements: (1) a presentation made by a representative of Canfield Solutions to district administrators ("Canfield presentation"); and (2) a "professional boundaries" policy subsequently adopted by the District along with related procedures. Ex. 73, 74, 115.

The Canfield presentation included various statistics concerning sexual abuse of students by school personnel, including (1) a slide stating that "[i]n Washington state alone, 26 school employees were in the headlines in 2007 for sexually molesting students," Ex. 115, at 4; and (2) a slide stating that 12 percent of such offenders were school bus drivers and showing a *Seattle Times* article headlined "School-bus Driver, 48, Accused of Misconduct." Ex. 115, at 16. This presentation emphasized the importance of reporting suspected impropriety and gave examples of inappropriate conduct, including (1) "[b]eing alone with student out of view of others," (2) "[b]us driver allows 5th grade girl to sit on his lap," and (3) "[e]ngages in peer-like behavior with students." Ex. 115, at 14-15.

The District's professional boundaries policy, adopted May 24, 2010, and associated procedures similarly described inappropriate conduct. The policy specified that "[s]taff

interactions with students must serve an educational purpose," namely "one that relates to the staff members' duties in the District," and stated the expectation that staff would report issues to a supervisor "whenever they suspect or are unsure whether conduct" violates the policy. Ex. 73. The procedures required staff to "promptly notify" an administrator "if they become aware of a situation that *may* constitute a violation" of the policy, and mandated training on the policy for all staff. Ex. 74, at 2 (emphasis added).

Beth Scouller, the District's human resources director, testified that she did not use the Canfield presentation itself to train staff because she "felt people would reject some of the negativity of the message." VRP at 1386. Instead, Scouller prepared a one-page summary on a large pad of paper that did not include the above statistics or most of the specific examples of inappropriate conduct. The summary did, however, admonish staff to "report what concerns you." Ex. 36.

Scouller admitted that she did not train anyone at the transportation department concerning the information covered in the Canfield presentation until the month after Shafer's arrest. Paz testified that he did not receive any training on the Canfield materials or the District's professional boundaries policy and procedures until after Shafer's arrest. District driver Thompson testified that he had never seen the professional boundaries policies and procedures or the information in the Canfield presentation. Thompson stated that it would have been useful to learn the statistics concerning bus drivers and other school personnel sexually abusing students because, prior to Shafer's arrest, he "couldn't imagine Gary doing any of this." VRP at 272-73.

Stanley confirmed that the transportation department did not receive any training on the Canfield materials or the professional boundaries policy and procedures until after Shafer's

arrest. Principal Drummer likewise testified that she did not recall Scouller ever coming to NL's school to train staff regarding the information in the Canfield presentation. Drummer also testified that she did not recall receiving the professional boundaries policy and procedures until after Shafer's arrest.

E.     Statements on Which Gutierrez's Experts Relied in Reaching Their Opinions

Chris McGoey, a professional security consultant specializing in "the anticipation, recognition and prevention of crime on properties open to the public," testified on behalf of Gutierrez. VRP at 649-50. The District had again moved to exclude McGoey's testimony on the grounds that McGoey had no "experience or training in the area of school transportation" and that his opinions "[were] not based on scientific, technical or other specialized knowledge . . . [or] on any recognized rules or standards in the industry." Clerk's Papers (CP) at 1252; VRP at 633-41. The trial court denied the motion on the condition that Gutierrez lay a proper foundation for McGoey's opinion, informing the District that

> if you feel it still hasn't been laid, instead of making argument in front of jury, which I know you're not going to do, just [say,] "I renew my objection." It will be for the record if you feel at that point you need to voir dire, but I'm probably not going to change my mind, but it just preserves your objection without interrupting the experts' testimony and sending the jury out, which I don't want to do.

VRP at 645. After Gutierrez questioned McGoey about his qualifications and the basis for his opinions, however, the District did not renew its objection.

McGoey opined that the District had missed many opportunities to discover or prevent Shafer's misconduct because the District lacked "ordinary policies and procedures and systems [that] would have caught the unusual behavior." VRP at 666. Gutierrez then raised Paz's testimony that Shafer had ridden NL's bus only three times, asking McGoey whether he had

11

reviewed evidence "that shows Gary Shafer actually rode up to twenty times with Mario Paz." VRP at 667. The District objected, and the trial court heard argument outside the presence of the jury.

The trial court overruled the objection and allowed McGoey to testify that, in addition to the previously admitted interview with Stines, he had reviewed a report from psychologist Mark Whitehill relating that NL had stated that Shafer rode her bus 20 times. The court first instructed the jury, however, as follows:

> Certain evidence has been admitted in this case only for a limited purpose. This evidence consists of testimony today by this expert regarding an interview [with NL]. . . . This evidence is not offered for the truth of the matter asserted but to explain this witness's testimony to you.

VRP at 671-72. When asked what conclusions he had drawn after weighing all the evidence reviewed as to how frequently Shafer rode the bus, McGoey testified, without objection:

> [D]efinitely more than three times, two or three times, multiple times. I have to accept the evidence I see on its face, twenty times or--but, you know, definitely more than three times.

VRP at 673. McGoey explained that he based this conclusion on, among other evidence, Shafer's record of riding along many times with other drivers and NL's and VV's apparent familiarity with Shafer.

McGoey opined that the District should have established a system to monitor when drivers were riding along on other routes so that supervisors could detect unusual patterns. McGoey also gave the opinion that the District should have had policies and procedures prohibiting drivers riding along on another's route from sitting with children out of the bus driver's view.

Psychologist Whitehill testified on behalf of Gutierrez concerning psychological harm to NL arising from Shafer's abuse. In discussing the materials on which he had based his opinion, Whitehill testified that he had observed his colleague, licensed mental health counselor Cynthia Beebe, conduct a half-hour video recorded interview with NL, the same video to which McGoey had referred. Over the District's objection, the trial court allowed Gutierrez to play for the jury an excerpt of the interview video in which Whitehill's colleague asked NL how many times Shafer had ridden her bus, and NL responded, "Twenty." VRP at 989-90.

F.      Jury Instructions, Verdict, and Post-trial Motions

The trial court ultimately instructed the jury on four of Gutierrez's claims:

1. Failing to provide reasonable protection for [NL];
2. Failing to properly supervise the activities of Gary Shafer;
3. Failing to enforce rules designed to protect passengers from inappropriate touching; and
4. Failing to train employees about the danger that some school employees pose a risk of molesting children.

CP at 1087. The court instructed the jury that the "District and its employees have a legal duty to exercise reasonable care to protect a student in its custody from reasonably foreseeable dangers" and that "[h]arm is reasonably foreseeable if the . . . District knew or should have known of the risk that resulted in the harm." CP at 1095. The instructions further specified that the jury could find a breach of this duty if "the actual harm fell within a general field of danger which should have been anticipated," even if it found that the District did not anticipate "the exact sequence of events" leading to the harm. CP at 1095. Over Gutierrez's objection, the trial court also instructed the jury that

> [w]ith regards to the criminal actions of any employee of the District, these actions are reasonably foreseeable only if the District and its employees knew or in the

exercise of reasonable care should have known that the employee was a risk to harm a student.

CP at 1095.

The jury returned a verdict for Gutierrez, awarding damages to her and NL in the amount of $1,425,000. Over the District's objection, the trial court entered judgment on this verdict. The District unsuccessfully moved for a new trial or remittitur and timely appealed.

## ANALYSIS

The District urges that the trial court made several erroneous evidentiary rulings and that the properly admitted evidence is not sufficient to support the jury's verdict.[3] We address each contention in turn.

### I. STANDARDS OF REVIEW AND GOVERNING LAW

Trial courts have "broad discretion in ruling on evidentiary matters and will not be overturned absent manifest abuse of discretion." *Sintra, Inc. v. City of Seattle*, 131 Wn.2d 640,

---

[3] The District also assigns error to the trial court's denial of the District's motion for judgment as a matter of law and to its entry of judgment on the verdict. As for the first, the District unsuccessfully moved for judgment as a matter of law based on insufficient evidence at the close of Gutierrez's case-in-chief, but did not renew the motion at the close of all the evidence. Where the trial court denies a defendant's motion for judgment as a matter of law at the close of the plaintiff's case, and the defendant proceeds to present evidence, the defendant waives any challenge to the ruling on appeal. *Goodman v. Bethel Sch. Dist. No. 403*, 84 Wn.2d 120, 123, 524 P.2d 918 (1974); 4 KARL B. TEGLAND, WASHINGTON PRACTICE, RULES PRACTICE, CR 50 at 220 (6th ed. 2013).

As for the second, the District also opposed entry of judgment in the trial court on the grounds that the court had not instructed the jury to discount NL's future medical expenses to their present value or included the postjudgment interest rate. Having raised no exception to RAP 2.5's preservation requirement, the District may argue this assignment of error on appeal only on the grounds raised in the trial court. *Fischer-McReynolds v. Quasim*, 101 Wn. App. 801, 814, 6 P.3d 30 (2000). The District has thus waived this assignment of error on appeal by failing to present supporting argument or authority in its appellate briefing on the damages and interest issues raised below. *Smith v. King*, 106 Wn.2d 443, 451-52, 722 P.2d 796 (1986); *see also* RAP 10.3.

662-63, 935 P.2d 555 (1997). Our Supreme Court has articulated this standard of review as follows:

> A trial court abuses its discretion when its decision is manifestly unreasonable or based upon untenable grounds or reasons. A trial court's decision is manifestly unreasonable if it adopts a view that no reasonable person would take. A decision is based on untenable grounds or for untenable reasons if the trial court applies the wrong legal standard or relies on unsupported facts.

*Salas v. Hi-Tech Erectors*, 168 Wn.2d 664, 668-69, 230 P.3d 583 (2010) (internal quotation marks and citations omitted). Further, we will not reverse based on the trial court's erroneous evidentiary ruling unless, "'within reasonable probability, [it] materially affected the outcome of the trial.'" *Brundridge v. Fluor Fed. Servs., Inc.*, 164 Wn.2d 432, 446, 191 P.3d 879 (2008) (quoting *State v. Halstien*, 122 Wn.2d 109, 127, 857 P.2d 270 (1993)).

We also review a trial court's denial of a motion for a new trial for abuse of discretion. *Smith v. Orthopedics Int'l, Ltd.*, 170 Wn.2d 659, 664, 244 P.3d 939 (2010). Where the trial court bases its denial of a motion for a new trial on issues of law, however, we review the decision de novo. *Orthopedics Int'l*, 170 Wn.2d at 664.

Under the doctrine of respondeat superior, employers are vicariously liable for torts committed by employees acting on the employer's behalf. *Niece v. Elmview Grp. Home*, 131 Wn.2d 39, 48, 929 P.2d 420 (1997). The scope of employment limits this liability: "Where the employee steps aside from the employer's purposes in order to pursue a personal objective of the employee, the employer is not vicariously liable." *Niece*, 131 Wn.2d at 48 (citing *Kuehn v. White*, 24 Wn. App. 274, 277, 600 P.2d 679 (1979)). The scope of employment does not, of course, "limit . . . an employer's liability for a breach of its own duty of care." *Niece*, 131 Wn.2d at 48. Thus, the conduct of an employee may give rise to a cause of action against the employer

for negligent supervision based on a breach of the employer's independent duty to foreseeable plaintiffs. *Niece*, 131 Wn.2d at 48.

Negligent supervision claims proceed under a theory of liability "analytically distinct and separate from vicarious liability . . . [and] based on the theory that 'such negligence on the part of the employer is a wrong to [the injured party], entirely independent of the liability of the employer under the doctrine of respondeat superior.'" *Niece*, 131 Wn.2d at 48 (quoting *Scott v. Blanchet High Sch.*, 50 Wn. App. 37, 43, 747 P.2d 1124 (1987). This theory of liability stems from the relationship between the employer and the employee.

> Even where an employee is acting outside the scope of employment, the relationship between employer and employee gives rise to a limited duty, owed by an employer to foreseeable victims, to prevent the tasks, premises, or instrumentalities entrusted to an employee from endangering others.

*Niece*, 131 Wn.2d at 48.

Our courts have generally limited the scope of an employer's liability for negligent supervision, however, to cases where "the employer knew, or in the exercise of reasonable care should have known, that the employee presented a risk of danger to others." *Niece*, 131 Wn.2d at 48-49. This relationship between employer and employee may also give rise to a related duty on the part of employers to adequately train their employees. *Brown v. Labor Ready Nw., Inc.*, 113 Wn. App. 643, 655-56, 54 P.3d 166 (2002); *Strachan v. Kitsap County*, 27 Wn. App. 271, 276-77, 616 P.2d 1251 (1980).

Our Supreme Court has further distinguished, from both vicarious liability and negligent supervision, the cause of action that arises out of a protective special relationship between an employer and the injured party. *Niece*, 131 Wn.2d at 43-49. The placement of children under a school's custody and control gives rise to a duty on the part of the school "to protect students in

its custody from reasonably anticipated dangers," including from "the intentional or criminal conduct of third parties." *Niece*, 131 Wn.2d at 44 (citations omitted). This duty is not limited to actions within an employee's scope of employment. *Niece*, 131 Wn.2d at 47-49. The duty of the District arising from this special protective relationship is limited "only by the concept of foreseeability." *Niece*, 131 Wn.2d at 50.

According to this principle, even "[i]ntentional or criminal conduct may be foreseeable unless it is 'so highly extraordinary or improbable as to be wholly beyond the range of expectability.'" *Niece*, 131 Wn.2d at 50 (quoting *Johnson v. State*, 77 Wn. App. 934, 942, 894 P.2d 1366 (1995)). Thus, "as long as the possibility of sexual assaults" on students by bus drivers lies "within the general field of danger which should have been anticipated," the District may properly be held liable for its failure to take reasonable precautions against such foreseeable misconduct. *Niece*, 131 Wn.2d at 50.

## II. ADMISSION OF EVIDENCE THAT NL SAID SHAFER RODE HER BUS 20 TIMES

The District contends that the trial court erred in allowing Whitehill and McGoey to testify concerning NL's statement that Shafer rode her bus 20 times and by allowing the jury to watch the video of NL making this statement. Specifically, the District argues that the court abused its discretion because (1) the statement was hearsay and the court improperly applied the ER 803(a)(3) hearsay exception for statements of a declarant's then-existing state of mind and (2) the court improperly applied ER 703, which allows experts to rely on inadmissible facts and data, by failing to first balance the statement's probative value against the risk of unfair prejudice under ER 403. The District maintains that (3) the evidence unfairly prejudiced it because it had no opportunity to cross-examine NL, whom the court never found competent to testify,

17

concerning this statement. The District further contends that the admission of the statement prejudiced it because (4) both experts vouched for the truth of the statement, and (5) the court's limiting instruction was ineffective.

As an initial matter, Gutierrez invites us to decline to consider some of the District's arguments. First, Gutierrez contends that the District may not complain on appeal about the showing of the video because the District invited any error by asking the trial court to play the similar video of NL's interview with Stines. As the District points out, however, a party may choose not to object to some inadmissible evidence without waiving the right to object to other similar evidence. *Patterson v. Kennewick Pub. Hosp. Dist. No. 1*, 57 Wn. App. 739, 744-45, 790 P.2d 195 (1990). We reject Gutierrez's invited error argument.

Gutierrez's contentions that the District waived its arguments concerning NL's competency, the experts' alleged vouching, and the trial court's failure to conduct the ER 403 balancing by not objecting on these grounds in the trial court, however, have merit. We address them where relevant.

As to the merits of the District's arguments, Gutierrez counters that the District presents a "straw man" argument concerning ER 803(a)(3) because the trial court did not rely on that rule in allowing reference to NL's "[t]wenty times" statement. Br. of Resp't at 37 n.8. Gutierrez further argues that trial courts have discretion to allow expert witnesses to reveal the bases for their opinions even though the information relied on amounts to otherwise inadmissible hearsay from an incompetent witness, and that, so long as the court gives a proper limiting instruction, a trial court may admit the basis of an expert's opinion without explicitly weighing its probative value against the risk of unfair prejudice. Finally, Gutierrez maintains that the District cannot

show any unfair prejudice because the trial court gave a proper limiting instruction that we must presume the jury followed.

A.    ER 803(a)(3)

The District argues first that the trial court abused its discretion by allowing Whitehill to testify concerning NL's "[t]wenty times" statement under the ER 803(a)(3) exception to the rule against hearsay. However, the record shows that the court referred to ER 803(a)(3) only in passing when ruling on the District's objection to Whitehill's testimony about material he had reviewed from Stines' interviews with NL and VV. The record makes clear that the court referred to ER 803(a)(3) in the context of explaining why it had allowed Stines to testify concerning the nature of the relationship between Shafer and the two kindergarten girls with whom he rode on the school bus:

> I allowed evidence of the general nature of the relationship that Gary Shafer had with these girls without specifics, and I previously at the request of counsel read a limiting instruction that this evidence is offered for the purpose of describing the nature of the relationship that Gary Shafer had with these victims. I wrote down I will allow it under 803(a)(3). This was with respect to Cheryl Stines, detective, but I won't allow the detail regarding GS's touching; i.e., his admissions that I had previously excluded, but I would allow it to describe the relationship that Gary Shafer had with [NL] and [VV], and to include tickling, sat on lap, knock-knock jokes from phone and back scratching. And I wrote these notes in the context of Detective Stines' testimony.

VRP at 1000. The trial court, therefore, did not rely on ER 803(a)(3) in allowing Whitehill to testify to NL's "[t]wenty times" statement.

B.    ER 703 and 705

ER 703 provides that

> [t]he facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the

hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence.

McGoey and Whitehill both testified that in reaching their opinions, experts in their respective fields routinely rely on victims' statements. The trial court properly instructed the jury to consider the "[t]wenty times" statement only as to the basis of the experts' opinions. Except to the extent that the District challenges McGoey's qualifications to give expert opinions on school bus safety standards at all, the parties do not dispute that the trial court properly allowed the experts to give opinions based on NL's statements in general.[4]

The more sharply contested question is whether the trial court erred in allowing the jury to hear testimony about NL's "[t]wenty times" statement. ER 705 addresses this situation, providing that

> [t]he expert may testify in terms of opinion or inference and give reasons therefor without prior disclosure of the underlying facts or data, unless the judge requires otherwise. The expert may in any event be required to disclose the underlying facts or data on cross examination.

Read together, ER 703 and ER 705 allow expert witnesses to testify concerning the reasons for their opinions, even though the information relied on would otherwise be inadmissible. The rules give trial courts discretion whether to allow the jury to hear the experts' underlying information with one exception: Under ER 705 the court must allow disclosure of the underlying facts or data if the adverse party demands the underlying information on cross-examination.

---

[4] The District does not challenge the experts' reliance on NL's statement in its opening brief, but does raise such a challenge in its reply brief. However, "[a]n issue raised and argued for the first time in a reply brief is too late to warrant consideration." *Cowiche Canyon Conservancy v. Bosley*, 118 Wn.2d 801, 809, 828 P.2d 549 (1992). Therefore, we do not consider this challenge.

The District contends that these rules do not give "the party calling the expert . . . the automatic right to have the expert *say* he relied on [the underlying information]," but instead allow only the adverse party to present the basis for the expert's opinion. Br. of Appellant at 36-37, 38 n.17 (citing *State v. Martinez*, 78 Wn. App. 870, 879-80, 899 P.2d 1302 (1995)). As a matter of logic, the latter proposition does not follow from the former, and Washington precedents, including those cited by the District, establish that trial courts have discretion to allow the party calling the expert to elicit the otherwise inadmissible information underlying an expert's opinion. For example, we have held that, although

> "ER 703 is not designed to allow a witness to summarize and reiterate all manner of inadmissible evidence. The trial court may allow the admission of hearsay evidence and otherwise inadmissible facts for the limited purpose of showing the basis of the expert's opinion."

*Hickok-Knight v. Wal-Mart Stores, Inc.*, 170 Wn. App. 279, 314, 284 P.3d 749 (2012) (internal quotation marks omitted) (quoting *Deep Water Brewing, LLC v. Fairway Res. Ltd.*, 152 Wn. App. 229, 275, 215 P.3d 990 (2009)), *review denied*, 176 Wn.2d 1014 (2013); *accord In re Det. of Marshall*, 122 Wn. App. 132, 146, 90 P.3d 1081 (2004), *aff'd*, 156 Wn.2d 150 (2005) (holding that ER 705 "permits the court to allow the expert to relate the hearsay to the fact finder to explain the reasons for her opinion"). Similarly, in *State v. Eaton*, 30 Wn. App. 288, 294, 633 P.2d 921 (1981), we held that a trial court erred in requiring the defendant to testify before allowing a defense expert to relate the defendant's prior statements because "it is of no moment that defendant's statements in the psychiatric interviews might be inadmissible hearsay, *if* a psychiatrist could reasonably rely upon them in forming an opinion about defendant's mental condition at the time of the crime."

Our holdings in these cases are consistent with the leading practitioner's treatise on Washington's evidence law, which explains:

> Rule 705 states that an expert may "give reasons" for his or her opinion "unless the judge requires otherwise." And since Rule 703 allows an expert to base an opinion upon hearsay if it is reasonable to do so, Rule 705 permits (but does not require) the court to allow the expert to relate the hearsay to the jury to explain the reasons for his or her opinion, subject to appropriate limiting instructions.

5B KARL B. TEGLAND, WASHINGTON PRACTICE, EVIDENCE LAW AND PRACTICE § 705.4, at 292 (5th ed. 2007) (footnotes omitted).

The authority on which the District relies is not to the contrary: In *Martinez*, we noted that "[a]lthough the trial court may allow disclosure of underlying facts or data, 'courts have been reluctant to allow the use of ER 705 as a mechanism for admitting otherwise inadmissible evidence as an explanation of the expert's opinion.'" 78 Wn. App. at 879 (quoting *State v. Anderson*, 44 Wn. App. 644, 652, 723 P.2d 464 (1986)). In *Martinez* we held that the trial court had not abused its discretion by refusing to allow a defense expert to relate hearsay statements in explaining the basis of his opinion. 78 Wn. App. at 879-81. This holding does not establish, though, that a trial court would necessarily abuse its discretion by allowing such testimony. Indeed, we explicitly stated that "the trial court may allow disclosure of underlying facts or data." *Martinez*, 78 Wn. App. at 879.

Similarly, the District cites *State v. Nation*, 110 Wn. App. 651, 661, 41 P.3d 1204 (2002) and *Anderson*, 44 Wn. App. at 652, for the proposition that only the adverse party may require disclosure of otherwise inadmissible information underlying an expert's opinion. Neither authority supports the District's proposition. In *Anderson*, as in *Martinez*, we merely held that the trial court had not abused its discretion by refusing to allow an expert to relate hearsay,

noting that "the disclosure of the underlying facts . . . may be required either by the court or the cross examiner." *Anderson*, 44 Wn. App. at 652-53. In *Nation*, Division Three of our court held that a trial court had erred in allowing the State's expert to relate hearsay to the jury, but on the ground that, where the requirements of ER 703 are not met: "ER 705 may not be used as a mechanism for admitting otherwise inadmissible evidence as an explanation of an expert's opinion." *Nation*, 110 Wn. App. at 662. Whether the requirements of ER 703 are met is not at issue here.[5] Thus, we hold that the trial court did not err under ER 703 and ER 705 in allowing the jury to hear testimony about NL's "[t]wenty times" statement, on which the experts had based their opinions, while limiting the jury's consideration of this statement to this narrow purpose.

C.     ER 403

The District's argument that the trial court erred by failing to apply the ER 403 balancing test before allowing the jury to hear NL's "[t]wenty times" statement appears to rely on the following language from *Martinez*: "The trial court should determine under ER 403 whether to allow disclosure of inadmissible underlying facts based upon whether the probative value of this information outweighs its prejudicial or possibly misleading effects." 78 Wn. App. at 879 (citing LAIRD C. KIRKPATRICK, OREGON EVIDENCE, at 311 (1982)). That a trial court "should" make this determination hardly establishes that a trial court commits reversible error by failing to

---

[5] The District presents no argument or authority in its opening brief that the expert opinions based on NL's statements do not meet the requirements of ER 703; but it does present such an argument in its reply brief, pointing out that it made such an argument to the trial court. Again, "[a]n issue raised and argued for the first time in a reply brief is too late to warrant consideration." *Cowiche Canyon Conservancy*, 118 Wn.2d at 809. We decline to consider the issue further.

evaluate the evidence under ER 403 on the record. As the District did not object on ER 403

grounds in the trial court here, and cites no authority establishing that failure to conduct the ER

403 analysis on the record amounts to reversible error, we decline to consider the argument

further. RAP 2.5, 10.3(a)(6); *DeHaven v. Gant*, 42 Wn. App. 666, 669, 713 P.2d 149 (1986)

("Even if an objection is made at trial, a party may only assign error in the appellate court on the

specific ground of the evidentiary objection made at trial.").

D.    Vouching

We also decline to reach the District's claims that McGoey and Whitehill vouched for the

truth of NL's "[t]wenty times" statement. The District did not object to the challenged testimony

on that ground at trial. Thus, the District failed to preserve the issue by raising a timely and

specific objection below. RAP 2.5(a); *DeHaven*, 42 Wn. App. at 669.

E.    Effect of the Limiting Instruction

Our Supreme Court has explained the proper use of otherwise inadmissible evidence to

explain the basis for an expert's opinion as follows:

> "[I]f an expert states the ground upon which his opinion is based, his explanation
> is not proof of the facts which he says he took into consideration. His explanation
> merely discloses the basis of his opinion in substantially the same manner as if he
> had answered a hypothetical question. It is an illustration of the kind of evidence
> which can serve multiple purposes and is admitted for a single, limited purpose
> only."

*Grp. Health Coop. of Puget Sound, Inc. v. Dep't of Revenue*, 106 Wn.2d 391, 400, 722 P.2d 787

(1986) (quoting *State v. Wineberg*, 74 Wn.2d 372, 382, 444 P.2d 787 (1968)). To properly allow

such testimony, a "trial court need only give an appropriate limiting instruction explaining that

the jury is not to consider this revealed information as substantive evidence." *In re Det. of Coe*,

175 Wn.2d 482, 513-14, 286 P.3d 29 (2012).

As discussed above, the trial court gave a proper limiting instruction in both instances prior to allowing the jury to learn about NL's "[t]wenty times" statement. The District argues, however, that it is "unrealistic to think jurors could avoid considering references to NL's statement for a purpose other than deciding how frequently Shafer had ridden her bus" because "the purpose for which the NL statement was ostensibly offered and allowed in evidence was congruent with the purpose for which the court told the jury the statement could not be considered." Br. of Appellant at 46-47.

Our Supreme Court recently rejected an argument indistinguishable from the District's on the ground that the jury is presumed to follow the court's instructions. *Coe*, 175 Wn.2d at 514-15 (involving an expert's disclosure of otherwise inadmissible unadjudicated prior offenses during a sexually violent predator commitment trial). Therefore, the District's argument fails.

F. Admission of the Video Recording of the Psychologist's Interview with NL

The District contends that, even if the trial court had discretion to allow Gutierrez's experts to relate NL's "[t]wenty times" statement to the jury, the court nonetheless committed reversible error by showing the jury the video of NL making the statement. The District points out that, had Gutierrez sought to have NL testify at trial, the trial court would have assessed her competency and the District could have cross-examined her concerning alleged inconsistencies between her statement to Stines and her statement to the psychologist.[6]

---

[6] The District had the opportunity to cross-examine McGoey and Whitehill concerning the reliability of statements from children, the possibility that someone had suggested the number 20 to NL, and other matters bearing on the reasonableness of their reliance on NL's statement, but initially chose not to do so. After a juror submitted a question to Whitehill asking, "How reliable is the information gathered from a five- to six-year-old child?", VRP at 1035, the District posed a series of questions on the reliability of NL's statements. VRP at 1047-048.

NL did not testify as a witness at trial, making issues of competency and cross-examination irrelevant; and the court gave a proper limiting instruction to consider her "[t]wenty times" statement only as it reflected the basis for the experts' opinions, an instruction we presume the jury followed. *Coe*, 175 Wn.2d at 514-15. Nonetheless, we agree with the District that the trial court erred in allowing the jury to watch the video of NL's statement to the experts. We disagree, however, that this error warrants reversal.

Our Supreme Court initially articulated the rule governing disclosure of facts underlying an expert's opinion, now codified in ER 705, as follows:

> [W]hen an expert is allowed to testify to a[n] . . . opinion which is in part based on facts which would normally be hearsay and inadmissible as independent evidence, *the trial court may in its discretion allow the expert to state such facts* for the purpose of showing the basis of the opinion.

*Wineberg*, 74 Wn.2d at 384. The *Wineberg* court thus contemplated that the underlying facts would come in only through the expert's testimony, not through independent evidence of those facts. The language of the rule as adopted reflects this distinction: "The expert may testify in terms of opinion . . . and give reasons therefor . . . [and] may in any event be required to disclose the underlying facts or data." ER 705. That experts may give reasons for their opinions and state or disclose the facts relied upon does not establish that the party calling the expert may then introduce independent evidence of those underlying facts.

Although the trial court properly allowed McGoey and Whitehill to refer to NL's "[t]wenty times" statement under ER 703 and ER 705, these rules did not permit Gutierrez to show the video of NL making the statement. Admitting the video, furthermore, potentially increased the likelihood that the jury would disregard the court's limiting instruction and take NL's statements for the truth of the matter asserted. We hold that the trial court erred in

26

admitting the video. Whether the error requires reversal presents a different question, addressed below.

### III. THE ADMISSION OF MCGOEY'S EXPERT OPINION TESTIMONY

The District contends that the trial court erred in admitting McGoey's opinions concerning a school district's standard of care because those opinions "amounted to nothing more than gratuitous, retrospectively conceived rules" and McGoey admitted that he did not know of any school district that had the sort of policies he recommended. Br. of Appellant at 52-53. Gutierrez counters that the District waived this issue by failing to renew its objection to McGoey's qualifications during his testimony and, in the alternative, that the trial court did not abuse its discretion in finding McGoey qualified and admitting his opinions. We agree with Gutierrez's first argument.

As noted, the trial court denied the District's motion in limine to exclude McGoey's opinions. When a trial court denies a motion in limine, "the losing party is deemed to have a standing objection where a judge has made a final ruling on the motion, '[u]nless the trial court indicates that further objections at trial are required when making its ruling.'" *State v. Powell*, 126 Wn.2d 244, 256, 893 P.2d 615 (1995) (quoting *State v. Koloske*, 100 Wn.2d 889, 895, 676 P.2d 456 (1984), *overruled on other grounds by State v. Brown*, 111 Wn.2d 124, 761 P.2d 588 (1988), *aff'd*, 113 Wn.2d 520 (1989)). "[W]hen a ruling on a motion in limine is tentative, any error in admitting or excluding evidence is waived unless the trial court is given an opportunity to reconsider its ruling." *State v. Carlson*, 61 Wn. App. 865, 875, 812 P.2d 536 (1991). Our Supreme Court has explained the difference between a final and a tentative ruling on such a motion as follows:

> If the trial court has made a definite, final ruling, on the record, the parties should be entitled to rely on that ruling without again raising objections during trial. When the trial court refuses to rule, or makes only a tentative ruling subject to evidence developed at trial, the parties are under a duty to raise the issue at the appropriate time with proper objections at trial.

*Koloske*, 100 Wn.2d at 896.

Here, the trial court expressly told the District that, although the court would not likely change its mind, to preserve the issue the District had to renew its objection after McGoey testified to his qualifications. Under *Koloske*, 100 Wn.2d at 895-96, by failing to do so the District waived any objection.

## IV. GUTIERREZ'S TESTIMONY CONCERNING NL'S STATEMENT THAT SHAFER OFTEN RODE NL'S BUS

The District argues that the trial court abused its discretion in admitting Gutierrez's testimony that NL said that Shafer "always rode the bus" and that he rode the bus "two times a week for a while" because the testimony qualified as hearsay and no exception to the rule against hearsay applied. Br. of Appellant at 49-50. Gutierrez counters that the trial court properly admitted this evidence because it was offered, not for the truth of the matter asserted, but as circumstantial evidence of NL's state of mind. We agree with the District that the trial court erred in admitting this testimony; but we do not agree that reversal is required because of the error.

Gutierrez relies on the general rule that a statement is not hearsay unless offered to prove the truth of the matter asserted.[7] Br. of Resp't at 52. In support of this argument, Gutierrez cites *Betts v. Betts*, 3 Wn. App. 53, 473 P.2d 403 (1970), a child custody case predating the adoption

---

[7] Because NL's statements about how often Shafer rode the bus did not expressly assert any particular state of mind, the ER 803(a)(3) exception to the hearsay rule plainly did not apply.

of the current evidence rules. *See* 5C TEGLAND, *supra*, § 803.16, at 57-58. We held in *Betts* that the rule against hearsay did not prohibit admission of a child's statements that the child's stepfather was mean and had killed the child's brother because they "were not admitted to prove the truth of the assertions she made, but merely to indirectly and inferentially show the mental state of the child at the time of the child custody proceedings," namely, that the child feared the stepfather. 3 Wn. App. at 59.

Here, neither the record nor Gutierrez's brief makes entirely clear the proper purpose for which Gutierrez purportedly offered NL's statements. Initially, Gutierrez argues that she offered the statements about how often Shafer rode the bus as circumstantial evidence that NL felt familiar enough with him to consider him a friend. Later in the same paragraph of her brief, however, Gutierrez states that

> N.L.'s feeling of friendship with Shafer, in turn, was probative to demonstrating that Shafer had ridden her bus frequently enough to cultivate a friendship and groom her for sexual molestation, and ultimately toward establishing the damages caused by Shafer's grooming.

Br. of Appellant at 53.

Thus, Gutierrez effectively, if obliquely, admits that the challenged statements were offered to prove the truth of the matter asserted: the frequency with which Shafer rode NL's bus. The trial court did not instruct the jurors that they could consider the statements only for some proper purpose, but simply overruled the District's hearsay objection without comment. The challenged statements are hearsay and do not fall within the scope of any asserted exception. Therefore, the trial court erred in admitting NL's statements to Gutierrez concerning how frequently Shafer rode the bus. As shown below, however, this error does not require reversal.

## V. STINES' TESTIMONY BASED ON VV'S DESCRIPTIONS OF INTERACTIONS WITH SHAFER

The District also contends that the trial court erred in allowing Stines to testify concerning information she obtained from VV regarding VV's and NL's interactions with Shafer on the bus because the testimony amounted to inadmissible hearsay. Gutierrez counters that this evidence fell under the ER 803(a)(3) exception to the rule against hearsay, or otherwise did not constitute hearsay, because Gutierrez offered it to prove VV's then-existing state of mind. We agree with Gutierrez.

ER 803(a)(3) provides that "[a] statement of the declarant's then existing state of mind, emotion, sensation, or physical condition (such as intent, plan, motive, design, mental feeling, pain, and bodily health)" is "not excluded by the hearsay rule, even though the declarant is available as a witness." This exception to the general ER 802 prohibition against hearsay testimony does not include, however, "a statement of memory or belief to prove the fact remembered or believed." ER 803(a)(3).

Stines related only one actual statement directly attributed to VV: that VV said Shafer "was her friend." VRP at 219. This statement, however, does not fall within the definition of "hearsay." ER 801(c) defines "hearsay" as "a statement, other than one made by the declarant while testifying . . . , offered in evidence to prove the truth of the matter asserted." Gutierrez clearly did not offer VV's statement to prove that Shafer and VV were friends. Instead, Gutierrez offered it to show that Shafer spent a substantial amount of time with VV and cultivated a close, peer-like relationship with her. This "friendship," in turn, tended to make it appear less reasonable that the District failed to notice that Shafer was taking advantage of the ride-along policy to develop inappropriate relationships with kindergarten girls. Furthermore, it

30

undermined the testimony of the District's employees who claimed that Shafer had ridden with NL and VV fewer than three times. The evidence of VV's statement was therefore relevant, not hearsay, and the trial court did not err in admitting it.

Other matters to which Stines testified, such as evidence of lap sitting, back scratching, and knock-knock jokes, did not expressly advert to any particular state of mind, and thus fall outside the ER 803(a)(3) hearsay exception. Again, however, Gutierrez did not specifically seek to prove that these things happened: Instead, Gutierrez offered evidence that VV talked about such matters only as circumstantial evidence of the declarant's state of mind, namely, that VV thought of Shafer as a close friend. *See* 5C TEGLAND, *supra*, § 803.16, at 57-63.

Indeed, during argument outside the presence of the jury after the District's hearsay objection, Gutierrez proposed a limiting instruction to that effect. The District, without waiving its objection to admission of the evidence, asked the court not to give the instruction. After Gutierrez declined to take a position on the matter, the trial court granted the District's request and did not give Gutierrez's proposed limiting instruction.

That Shafer had the opportunity to develop such a relationship with NL's seat mate had some tendency to make it more probable that, in the exercise of due care, the District should have realized that Shafer was abusing the ride along policy in order to get close to kindergarten girls. Evidence that Shafer developed a relationship with VV similar to that involving NL, contemporaneously and without detection, also tended to make the District's efforts to protect NL appear less reasonable. Thus, the evidence was relevant to Gutierrez's claims of negligent supervision of Shafer and failure to protect NL. Under our reasoning in *Betts*, 3 Wn. App. at 59-60, and the rule stated in 5C Tegland, *supra*, section 803.16, at 57-63, Gutierrez offered this

31

evidence for a proper purpose other than the truth of matters asserted in VV's statements. The trial court did not err in admitting Stines' testimony concerning the relationships between VV and Shafer and between NL and Shafer.

The District also argues that the trial court erred in admitting Stines' opinion that Shafer developed a relationship with the girls over the course of "multiple days," because Gutierrez did not call Stines to testify as an expert. VRP at 220-22. As Gutierrez points out, however, the District did not object to this testimony on that ground: In fact, the record shows that, although the District interposed numerous objections during Stines' testimony, it did not object to Stines' "multiple days" testimony at all. VRP 220-22. Because the District did not preserve this issue for review, we decline to address it on appeal. RAP 2.5.

## VI. ADMISSION OF EVIDENCE CONCERNING SHAFER'S OTHER CONVICTIONS

The District contends that the trial court erred in admitting Shafer's judgment and sentence for convictions of possession of child pornography and of child molestation while riding District school buses and for allowing Stines to testify about certain facts underlying these convictions. The District argues that (1) this evidence posed too great a risk of unfair prejudice to the District under ER 403, and (2) it amounted to "other Shafer wrongs" evidence prohibited by ER 404(b). Br. of Appellant at 51-52. Gutierrez argues that, although the District moved in limine to exclude the judgment and sentence, it affirmatively waived its objection at trial. Gutierrez argues in the alternative that the trial court properly admitted the judgment and sentence under ER 404(b) because it was offered for a proper purpose other than to prove that Shafer had acted in conformity with his later convictions when driving a bus for the District.

A.    No Waiver

Gutierrez's waiver argument fails. The District preserved its objection to the admission of the judgment and sentence by obtaining a final ruling on its motion in limine and renewing its objection on the record when Gutierrez offered the documents during trial. *Powell*, 126 Wn.2d at 256-57. Gutierrez selectively cites partial statements by the District's counsel that initially appear to demonstrate waiver, but, when read in context, do not. For example, Gutierrez quotes only the first two words, "No objection," of the District's response to her offer of Shaffer's judgment and sentence at trial, without mentioning that the District's full response was "[n]o objection *other than those I previously addressed in pretrial*." VRP at 226 (emphasis added); Br. of Resp't at 54.

B.    ER 404(b)

Except for evidence of the conviction based on Shafer's molesting NL, Gutierrez's alternative ER 404(b) argument also fails. ER 404(b) provides that

> [e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

Gutierrez satisfies the ER 404(b) test for only the NL molestation conviction. She does not satisfy the test for the others.

1. Conviction for molesting NL

To properly admit evidence of other bad acts, the trial court must first identify a proper purpose for the evidence, then weigh, on the record, the probative value of the evidence against the risk of unfair prejudice. *Brundridge*, 164 Wn.2d at 444-45. The parties did not dispute that Shafer molested NL. Thus, Gutierrez plainly did not offer evidence of Shafer's other crimes to

show that Shafer had acted "in conformity therewith" as to NL. With that, ER 404(b) did not bar the admission of these crimes on this ground.

The trial court admitted evidence of Shafer's conviction for molesting NL under the ER 803(a)(22) exception to the rule against hearsay, which allows admission of evidence of certain convictions "to prove any fact essential to sustain the judgment." The trial court apparently did so to avoid the possibility that jurors would incorrectly believe they had to decide whether Shafer had abused NL. Gutierrez had to establish that the abuse occurred to be entitled to a judgment in her favor. As an essential fact, the probative value of Shafer's conviction for molesting NL was exceedingly high. As stated in part A of the Facts, above, the trial court balanced the probative value of the evidence of the prior molestation convictions against the risk of unfair prejudice and ruled the judgment and sentence showing the prior convictions admissible. The court did not abuse its discretion in admitting evidence of Shafer's conviction for abusing NL.

2. Convictions for molesting other children

Evidence of Shafer's convictions for molesting other children, however, presents a different question. Gurierrez did not need to prove that Shafer had abused the other victims in order to obtain a favorable judgment, and the admission of Shafer's convictions for molesting other girls posed a risk of unfair prejudice to the District. That is, jurors could have allowed their outrage at the District's employing as a school bus driver an individual who was later convicted of multiple counts of child molestation to influence their decision on the merits of the case.

Shafer's convictions for molesting other children may have had some tendency to establish that the District should have realized that Shafer posed a risk. However, since the judgment and sentence itself revealed little about the timing or circumstances of the conduct

34

giving rise to these other convictions,[8] the probative value was low. This risk of unfair prejudice to the District, in our view, outweighed the scant probative value of Shafer's convictions for molesting the other girls. We also hold that the trial court erred in allowing Stines' testimony about Shafer's other child molestation convictions because the risk of prejudice from this evidence similarly outweighed its probative value. For these reasons, the trial court abused its discretion in ruling that the probative value of evidence of the other convictions outweighed the risk of prejudice. The evidence of Shafer's convictions for molesting girls other than NL was inadmissible under ER 403. Nevertheless, this error does not require reversal of the jury's verdict.

### 3. Conviction for possessing child pornography

Shafer's conviction for possession of depictions of a minor engaged in sexually explicit conduct, also part of the judgment and sentence, stemmed from files discovered on Shafer's home computer. Because the conduct giving rise to this charge did not occur on or involve District property, this conviction was not probative of what the District should have known about Shafer in hiring or retaining him as a school bus driver. Due to the absence of probative value and the high potential for prejudice, the trial court erred under ER 403 in admitting Shafer's child pornography conviction.

### VII. SUFFICIENCY OF THE EVIDENCE AND HARMLESS ERROR

The District contends that the trial court's evidentiary errors require us to reverse the jury's verdict and to remand for dismissal of Gutierrez's claim with prejudice. This is so, the

---

[8] The judgment and sentence gives only an overlapping range of dates for each charge, and does not make clear which charge pertains to which victim.

District argues, because, without the improperly admitted hearsay and assuming the jurors followed the court's limiting instructions, "not even a scintilla of admissible evidence supports the negligence and causation findings in the verdict." Br. of Appellant at 55. In the alternative, the District argues that we should remand for a new trial on both liability and damages because Gutierrez's "liability and damages theories went hand in hand." Br. of Appellant at 55.

We first consider whether sufficient evidence supports the jury's verdict under the pleadings and instructions. Concluding that it does, we then turn to the District's contention that the erroneous admission of evidence was sufficiently prejudicial to require reversal. We conclude that it was not.

A.      Sufficiency of the Evidence

In reviewing a claim that a jury's verdict rests on insufficient evidence, we must interpret the evidence most strongly against the party challenging the verdict and view the record in a light most favorable to the prevailing party, accepting the truth of the prevailing party's evidence and all favorable inferences that reasonably follow from it. *Bell v. Hegewald*, 95 Wn.2d 686, 689, 628 P.2d 1305 (1981). To sustain a verdict against such a challenge, however, requires more than "mere theory or speculation"; it requires "'substantial evidence' . . . , evidence of a character 'which would convince an unprejudiced, thinking mind of the truth of the fact to which the evidence is directed.'" *Hojem v. Kelly*, 93 Wn.2d 143, 145, 606 P.2d 275 (1980) (quoting *Arnold v. Sanstol*, 43 Wn.2d 94, 98, 260 P.2d 327 (1953)).

1. Scope of duty instruction--no assignment of error

The key liability instruction here, defining the scope of the District's duty, provided:

The Olympia School District and its employees have a legal duty to exercise reasonable care to protect a student in its custody from reasonably foreseeable

36

dangers. The Olympia School District has a legal duty to exercise reasonable care in supervising and training its employees. A student is in the custody of the school district while riding on a school bus.

Harm is reasonably foreseeable if the Olympia School District knew or should have known of the risk that resulted in the harm to plaintiffs.

It is not necessary that the exact sequence of events be anticipated. It is only necessary that the actual harm fell within a general field of danger which should have been anticipated.

With regards to the criminal actions of any employee of the District, these actions are reasonably foreseeable only if the District and its employees knew or in the exercise of reasonable care should have known that the employee was a risk to harm a student.

CP at 1095.

Under the law of the case doctrine we will not review an instruction, even if erroneous, to which no party has assigned error. RAP 10.3(g); *Noland v. Dep't of Labor & Indus.*, 43 Wn.2d 588, 590, 262 P.2d 765 (1953) ("No assignments of error being directed to any of the instructions, they became the law of the case on this appeal, and the sufficiency of the evidence to sustain the verdict is to be determined by the application of the instructions and rules of law laid down in the charge."). *See also Chelan County Deputy Sheriffs' Ass'n v. Chelan County*, 109 Wn.2d 282, 300 n.10, 745 P.2d 1 (1987). Gutierrez did not cross appeal or assign error to this instruction. Therefore, the instruction controls our decision.[9]

---

[9] Because we are bound by this instruction under the law of the case doctrine, we decline to rule on its correctness. However, we do not suggest that we would uphold this instruction's last sentence if properly challenged. This instruction appears to make the District liable for Shafer's misconduct only if it had constructive notice that Shafer in particular posed a risk of child abuse. In *Niece* our Supreme Court rejected the contention that a failure-to-protect claim requires proof of constructive notice that the specific employee involved posed a risk when a special relationship is present. *Niece*, 131 Wn.2d at 48-49. In reaching this conclusion for the operators of group homes, *Niece* relied in part on cases involving a school district's duty to protect students. *Niece*, 131 Wn.2d at 50-51 (citing *e.g.*, *McLeod v. Grant County Sch. Dist. No. 128*, 42 Wn.2d 316, 322, 255 P.2d 360 (1953)).

## 2. Constructive Notice

In deciding whether sufficient evidence supports the verdict under this instruction, we consider whether, viewing the record before us in a light most favorable to Gutierrez, a rational juror could have found that the District had constructive notice that Shafer posed a risk to students of the type of harm that occurred.

The jury heard testimony from Stines that NL and VV sat by each other in the same school bus seats every day. Thus, the jury could have inferred that at least some of Shafer's inappropriate conduct involving VV occurred prior to his abuse of NL. Gutierrez proposed instructing the jury to consider this testimony only for the purpose of describing the relationship Shafer had established with the girls; but at the District's request, the court did not give a limiting instruction. The jury could therefore have considered the evidence concerning VV for any purpose, including whether the District should reasonably have foreseen the risk Shafer posed. Standing alone, however, this evidence falls short of establishing that the District should have foreseen the risk from Shafer.

Whitehill's and McGoey's testimony concerning NL's statement to Whitehill's colleague that Shafer had ridden her bus "[t]wenty times" presents a similar issue. This time, however, the trial court instructed the jury to consider the evidence only for the purpose of evaluating the experts' opinions. Assuming, as we must in the absence of evidence to the contrary, that the jurors followed the court's limiting instruction, *Carnation Co. v. Hill*, 115 Wn.2d 184, 187, 796 P.2d 416 (1990), this evidence would not support a finding that the District should have known that Shafer posed a risk of sexual abuse.

38

The question remains, then, whether Gutierrez presented other evidence sufficient to persuade a fair minded juror that the District should have known in the exercise of due care that Shafer, specifically, posed a risk of abusing children. For the reasons that follow, we hold that she did.

From the recording of Stines' interview with NL, the jury could reasonably have inferred that Shafer rode NL's bus more frequently than Paz and Stanley suggested in their testimony. Stines also testified, without objection, that based on her investigation, she believed Shafer sat with NL "[m]ore than one [time], multiple days." VRP at 222.

Other unchallenged or properly admitted evidence further supports the inference that Shafer was riding along on kindergarten and preschool buses so frequently that the District should have become suspicious. The survey conducted by Stanley, the District's transportation manager, showed that driver Todd Adams, one of only five drivers who responded to the survey, recalled Shafer riding along on NL's bus on two occasions in September and October of 2010 when Adams substituted for Paz. In total, four of the five responding drivers recalled Shafer riding along a total of 11 times in the fall and early winter of 2010; the fifth recalled Shafer riding along in prior years.

In their testimony, bus drivers Thompson, Engle, and Reeves confirmed their answers on the survey. Thompson also recalled Shafer riding along 40 or more times on his kindergarten route, including 10 times in the preceding 2009-2010 school year. Reeves testified that Shafer asked to ride along on Reeves's kindergarten route; and Engle testified that Shafer rode along "a couple of times" and "sat and chatted with kids" when Engle substituted on kindergarten routes. VRP at 367-73. Although neither Paz nor Bakewell responded to the survey, Bakewell testified

that Shafer often rode along when Bakewell substituted as the bus driver on kindergarten and preschool routes. Paz testified that the first time Shafer asked to ride along on Paz's bus, he (Paz) had asked transportation director Stanley's permission, but had "never bothered asking again because Fred Stanley just let [Shafer] ride whenever he wanted." VRP at 69.

The jury could reasonably have inferred that, if Shafer rode NL's route two times in two months just on the occasions when Adams substituted for Paz, then Shafer was riding that route with some regularity. Further, if the few drivers who responded to Stanley's survey recalled 11 rides by Shafer in a four-month period, and other drivers who did not respond, Paz and Bakewell, also recalled Shafer riding along multiple times during that period, the jury could have reasonably concluded that Shafer was volunteering to ride along on kindergarten and preschool buses, including NL's bus, much more frequently than the two or three times Paz was willing to admit.[10]

NL's kindergarten teacher, Evans, testified that she sometimes saw NL's bus arrive at school and noticed an adult riding along "multiple times," even though she did not always see the bus arrive and had not specifically been paying attention. VRP at 418. Again, the jury could reasonably have inferred that, if Evans noticed someone on the bus on multiple occasions, Shafer had ridden the bus many more times than Evans noticed.

Furthermore, Paz's testimony that Shafer sat with NL and VV only for about 20 minutes during one bus ride was undermined by Paz's testimony that he was not surprised that NL and

---

[10] There were only 69 school days in the relevant period, and on 18 of those days Shafer drove a mid-day route for pay. Thus, even the 14 instances on which the District effectively admitted that Shafer rode along on mid-day routes amounted to more than one quarter of the remaining 51 school days.

VV knew Shafer as "Gary" because "[Shafer] asked them all the time." VRP at 95. Paz could hardly have meant that Shafer had asked the girls if they knew his name "all the time" during the course of this single, 20-minute ride. The jury could have reasonably inferred that Paz refused to admit that he routinely permitted Shafer to sit with NL and VV in the bus's blind spot and, thus, did not believe Paz's testimony about the frequency with which Shafer rode along.

The evidence showing that NL thought of Shafer as a great friend whom NL frequently talked about and even prayed for, also gave rise to a reasonable inference that Shafer sat with the girls on the bus many more than two or three times. Drummer testified that NL immediately recognized Shafer as "Gary," the man who had touched her, from his driver's license photo. VRP at 428-32. Gutierrez confirmed this, and described the depth of NL's feelings of friendship and concern for Shafer. Gutierrez also testified that NL had been "pretty shy" prior to the abuse and took a long time "to get to know people." VRP at 1062. Again, the jury could reasonably have inferred that a shy kindergarten girl would not have felt this degree of friendship and concern for an adult man she had met only once or twice, and that the relationship had in fact developed over numerous bus rides.

Similarly, Stines properly testified that NL's seat mate, VV, considered Shafer a friend. Stines identified, and the court admitted without objection, a picture VV had drawn of herself and Shafer, identified as "Gare." VRP at 219; Ex. 120. The jury could have reasonably inferred that a kindergarten girl would not draw such a picture of someone she had met only one or two times, or think of him as a friend.

From this evidence, the jurors could reasonably have concluded that Shafer actually rode along on the school bus many more times than the District admitted. From Adams' statement

that Shafer rode along on NL's bus on two occasions in September and October of 2010 when Adams substituted for Paz, the survey response by four drivers that Shafer rode along a total of 11 times in the fall and early winter of 2010, Thompson's testimony that Shafer rode along 40 or more times on his kindergarten route, including 10 times in the preceding 2009-2010 school year, and the evidence that NL thought of Shafer as a great friend and talked about and prayed for him, the jurors could reasonably have concluded that many of these rides occurred prior to Shafer's abuse of NL. They could then reasonably have inferred that (1) had the District fulfilled its duty to exercise due care, it would have noticed that Shafer was abusing the ride-along policy in order to have inappropriate contact with young children; and (2) the District's failure to do so proximately caused damages to NL and Gutierrez.

In addition to the evidence concerning the frequency with which Shafer rode along on NL's school bus, the jury heard evidence that Shafer's conduct while riding along was unusual and suspicious. Driver Engle, for example, testified that he could not recall any other transportation department employee besides Shafer who would move around the bus and sit with kindergarten children while riding along. Paz also admitted that he thought it "strange" that Shafer sat in the blind spot with kindergarten girls. VRP at 86-87. The trial court instructed the jury that "[a]ny act or omission of an officer or employee is the act or omission of the Olympia School District."[11]CP at 1085. Thus, the jury could have properly imputed this employee

---

[11] The trial court instructed the jury as follows:
> Defendant Olympia School District can only act through its officers and employees. Any act or omission of an officer or employee is the act or omission of the Olympia School District. Here, Mario Paz, Fred Stanley, Barbara Greer, and Beth Scouller were all employees of the Olympia School District during all relevant times.

CP at 1085 (Instruction 3).

knowledge to the District and also inferred from it that, in the exercise of due care, the District would have realized that Shafer was abusing the ride-along policy in a way that posed a risk of inappropriate contact with students.

Finally, Gearhart testified concerning his attempts to get the District to respond to his concerns about what had happened to his daughter the day that Shafer had substituted on her bus route. According to Gearhart, he spoke to various District employees, including Stanley's training coordinator Greer, but never got a satisfactory explanation. From this testimony, the jury could have concluded that, had the District properly followed up on Gearhart's complaint, it would have noticed Shafer's unusual behavior.

The court instructed the jury that the District owed the children a duty to exercise "the highest degree of care consistent with the practical operation of the bus." CP at 1094. The jurors could reasonably have found from the unchallenged and properly admitted evidence described above that, had the District fulfilled this duty, it would have noticed and put a stop to Shafer's misconduct before he molested NL.

The court also instructed the jury on Gutierrez's negligent training claim. As discussed, Gutierrez presented evidence that the District knew about the potential for sexual abuse of students by bus drivers, including Shafer, and developed policies to mitigate that risk, but failed to timely disseminate that knowledge and implement those policies. From the testimony of Mario Paz and Dale Thompson, the jury could have reasonably inferred that, had the District informed its drivers about the known dangers, one or more of them would have reported Shafer's apparent abuse of the District's ride-along policy. Thus, the jury could also have reasonably

inferred that the District breached its duty to train its employees, and that the breach proximately caused NL's damages.

We hold that sufficient evidence supports the jury's verdict.

B.    Harmless Error

The District has properly preserved for review three evidentiary errors by the trial court: the admission of (1) NL's statements to Gutierrez concerning how frequently Shafer rode NL's bus; (2) the video of NL saying that Shafer rode her bus 20 times; and (3) Shafer's convictions for molesting two other victims and for possession of child pornography. A trial court's erroneous admission of evidence merits reversal only if the error prejudiced the party opposing admission of the evidence; that is, only if, "within reasonable probabilities, the outcome of the trial would have been materially affected had the error not occurred." *Saldivar v. Momah*, 145 Wn. App. 365, 401, 186 P.3d 1117 (2008); *accord Brundridge v. Fluor Fed. Servs., Inc.*, 164 Wn.2d 432, 446, 191 P.3d 879 (2008). Thus, these errors require us to reverse the jury's verdict only if they affected, or presumptively affected, that verdict. *Brown*, 100 Wn.2d at 196. We do not generally consider the erroneous admission of hearsay prejudicial where it is merely cumulative of properly admitted evidence. *Brown*, 100 Wn.2d at 196.

From the properly admitted evidence, just summarized, the jury could reasonably have inferred that Shafer rode the bus with NL multiple times and that he rode on other kindergarten routes many more times. The erroneously admitted statements NL made to Gutierrez concerning the frequency with which Shafer rode her bus were merely cumulative of other evidence and cannot be said to have materially affected the outcome of the trial. Thus, we hold that the error in their admission was harmless.

Although we recognize that NL's direct statements were more potent than those recounted by others, the same analysis applies to the video. The video was merely cumulative of other evidence and cannot be said to have materially affected the outcome of the trial. In addition, the trial court instructed the jury to consider the video only for the purpose of evaluating Whitehill's opinions. Presuming, as we must, that the jury followed this instruction, we hold that admission of the video was also harmless.

Finally, in the context of a lengthy trial involving extensive properly admitted evidence that cast Shafer in a negative light, including the admission of Shafer's conviction for molesting NL, we see no reasonable probability that the admission of Shafer's other convictions materially affected the jury's verdict. Concluding that the trial court's errors were harmless, we affirm.

## VIII. ATTORNEY FEES

Gutierrez argues that she is entitled to attorney fees under RAP 18.9 because the District's appeal is frivolous and brought for purposes of delay. This claim lacks merit.

"An appeal is frivolous if, considering the entire record, the court is convinced that the appeal presents no debatable issues upon which reasonable minds might differ, and that the appeal is so devoid of merit that there is no possibility of reversal." *Advocates for Responsible Dev. v. W. Wash. Growth Mgmt. Hearings Bd.*, 170 Wn.2d 577, 580, 245 P.3d 764 (2010). The District's appeal raises fairly debatable issues, and presents certain claims that have some merit, although they do not warrant reversal. We deny Gutierrez's fee request.

## CONCLUSION

We hold that sufficient evidence supports the jury's verdict and that the District has failed

No. 44324-4-II

to show a sufficient probability that the trial court's evidentiary errors affected the outcome. We affirm.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

BJORGEN, A.C.J.

I concur:

HUNT, JPT

LEE, J. (dissenting) — I respectfully disagree with the majority. In my opinion, (1) the trial court abused its discretion by allowing Chris McGoey to testify about N.L.'s statement that Gary Shafer rode her bus 20 times, (2) the trial court abused its discretion by improperly admitting evidence of Shafer's convictions for molesting V.V. and T.M.C.,[12] (3) the trial court abused its discretion by improperly allowing Detective Cheryl Stines to testify about V.V.'s hearsay statements, (4) McGoey and Dr. Mark Whitehill improperly vouched for the credibility of N.L.'s statement that Shafer rode the bus 20 times, (5) the trial court improperly admitted the video of N.L.'s statement,[13] (6) the trial court improperly admitted Abbigail Gutierrez's hearsay testimony regarding N.L.'s statements,[14] and (7) the trial court improperly admitted evidence of Shafer's conviction for possession of depictions of a minor engaged in sexually explicit conduct.[15] These evidentiary errors in this case were not harmless. Accordingly, I would reverse and remand for a new trial.

---

[12] The majority agrees that the trial court improperly admitted the evidence of Shafer's convictions for molesting V.V. and T.M.C., so the issue will not be further addressed in this dissent except in the context of harmless error.

[13] The majority agrees that the trial court improperly admitted the video of N.L.'s statements, so the issue will not be further addressed in this dissent except in the context of harmless error.

[14] The majority agrees that the trial court improperly admitted Gutierrez's testimony regarding N.L.'s statements, so the issue will not be further addressed in this dissent except in the context of harmless error.

[15] The majority agrees that the trial court improperly admitted evidence of Shafer's conviction for possession of depictions of a minor engaged in sexually explicit conduct, so the issue will not be further addressed in this dissent except in the context of harmless error.

ANALYSIS

A.    EVIDENTIARY RULINGS

1.    McGoey's testimony about N.L.'s statements under the guise of expert testimony: ER 703 and ER 705

The Olympia School District (the District) argues that McGoey improperly testified to N.L.'s statement that Shafer rode the bus 20 times because N.L.'s statement was improperly admitted as a basis for his expert opinion. This court reviews the trial court's evidentiary rulings regarding expert testimony for an abuse of discretion. *Hickok-Knight v. Wal-Mart Stores, Inc.*, 170 Wn. App. 279, 313, 284 P.3d 749 (2012) (citing *Minehart v. Morning Star Boys Ranch, Inc.*, 156 Wn. App. 457, 463, 232 P.3d 591, *review denied*, 169 Wn.2d 1029 (2010)), *review denied*, 176 Wn.2d 1014 (2013). A trial court abuses its discretion when its decision is based on untenable grounds or untenable reasons. *Hickok-Knight*, 170 Wn. App. at 313 (citing *Yousoufian v. Office of Ron Sims, King County Exec.*, 168 Wn.2d 444, 458, 229 P.3d 735 (2010)). Determining whether the trial court properly allowed an expert to testify to otherwise inadmissible hearsay as the basis for his or her opinion requires applying both ER 703 and ER 705. *See Hickok-Knight*, 170 Wn. App. at 313-15; *State v. Martinez*, 78 Wn. App. 870, 879-80, 899 P.2d 1302 (1995), *review denied*, 128 Wn.2d 1017 (1996), *abrogated on other grounds by State v. Kinneman*, 155 Wn.2d 272, 119 P.3d 350 (2005).

ER 703 states:

> The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence.

Under ER 703, the trial court may not allow an expert to testify to an opinion unless the opinion is supported by facts or data which the expert reasonably relied upon. *Walker v. State*, 121 Wn.2d 214, 218, 848 P.2d 721 (1993) (expert opinions lacking an adequate foundation should be excluded). ER 703 allows an expert to form a valid, admissible *opinion* based on evidence that either has not been admitted at trial or that would otherwise be inadmissible. However, ER 703 does not make the facts and data underlying the opinion admissible. Determining whether the facts and data underlying the expert's opinion is admissible in trial is governed by ER 705.

ER 705 states:

> The expert may testify in terms of opinion or inference and give reasons therefor without prior disclosure of the underlying facts or data, unless the judge requires otherwise. The expert may in any event be required to disclose the underlying facts or data on cross examination.

The purpose of allowing an expert to testify to otherwise inadmissible hearsay is to explain the basis for the expert's opinion. *In re Det. of Leck*, ___ Wn. App. ___, 334 P.3d 1109, 1120 (citing *In re Det. of Marshall*, 156 Wn.2d 150, 163, 125 P.3d 111 (2005)), *review denied*, 335 P.3d 941 (2014). "However, 'it does not follow that such a witness may simply report such matters to the trier of fact: The Rule was not designed to enable a witness to summarize and reiterate all manner of inadmissible evidence.'" *Marshall*, 156 Wn.2d at 162 (quoting *State v. Devries*, 149 Wn.2d 842, 848 n.2, 72 P.3d 748 (2003)) (internal quotations marks omitted).

The District argues that it was improper for the trial court to admit N.L.'s statement that Shafer rode her bus 20 times as support for McGoey's opinion. I agree with the District. McGoey did not actually rely on N.L.'s statement when forming his opinion; he barely references N.L.'s statement in explaining his opinion. Therefore, N.L.'s statement that Shafer rode the bus 20 times should not have been admitted under the guise of "explaining" McGoey's opinion.

McGoey purportedly relied on N.L.'s statement that Shafer rode the bus 20 times to form his opinion that an organization needs policies and procedures in place so that the organization can recognize suspicious and unusual behavior. When "explaining" this opinion, McGoey testified that Shafer riding the bus 20 times was unusual behavior. This is the extent to which McGoey "relied" on N.L.'s statement that Shafer rode her bus 20 times. Based on McGoey's testimony as a whole, it was not necessary for McGoey to testify regarding N.L.'s statement to explain his opinion. When the otherwise inadmissible hearsay does not explain the expert's opinion, it does not serve the purpose that allows its admission. Therefore, N.L.'s statement that Shafer rode the bus 20 times was not admissible under ER 703 and ER 705 to explain McGoey's opinion.

Not only was there nothing about the fact that N.L. said Shafer rode the bus 20 times that explained the basis for McGoey's opinion, which was that the District lacked "ordinary policies and procedures and systems [that] would have caught the unusual behavior," RP at 666, there is no basis upon which McGoey could reach the conclusion that frequent ride alongs were unusual behavior. Overall experience in security is not necessarily sufficient to offer a conclusory opinion on what specifically constituted "unusual behavior" for a school bus driver. ER 702 (experts may testify to opinions when qualified by "knowledge, skill, experience, training or education."); *see Tortes v. King County*, 119 Wn. App. 1, 13, 84 P.3d 252 (2003) (In an action for negligence by King County Metro trial court properly excluded affidavit by an expert because, although expert was a security and law enforcement expert, the expert had no "expertise regarding the actual standard of care applicable to public transit operators."). McGoey's testimony about N.L.'s 20-times statement came only after Gutierrez asked him about evidence McGoey reviewed "that shows Gary Shafer actually rode up to twenty times with Mario Paz." RP at 667. Thus, N.L.'s

statement that Shafer rode her bus 20 times was not used to explain his opinion, and the trial court abused its discretion by allowing such testimony.

2. Stines' testimony about V.V.'s hearsay statements: ER 801(c) AND ER 803(a)(3)

In addition to its objection regarding the admissibility of N.L.'s statements, the District argues that the trial court improperly admitted hearsay through Stines' testimony. The majority holds that Stines' testimony was properly admitted. I do not agree that the trial court properly allowed Stines to testify to V.V.'s statement; rather the trial court abused its discretion by allowing Stines to testify about V.V.'s hearsay statements.

This court reviews de novo whether a statement is hearsay, but this court reviews the trial court's *ruling* regarding a hearsay objection for an abuse of discretion. *State v. Mason*, 160 Wn.2d 910, 922, 162 P.3d 396 (2007) (citing *State v. Stenson*, 132 Wn.2d 668, 701, 940 P.2d 1239 (1997)), *cert. denied*, 553 U.S. 1035 (2008). A trial court abuses its discretion if the trial court's decision was based on untenable grounds or untenable reasons. *Mason*, 160 Wn.2d at 922 (quoting *State v. C.J.*, 148 Wn.2d 672, 686, 63 P.3d 765 (2003)). When a trial court's ruling is based on the mistaken determination that a statement is not hearsay, the trial court abuses its discretion by admitting the statement. *See State v. Quismundo*, 164 Wn.2d 499, 504, 192 P.3d 342 (2008) ("[A] court 'would necessarily abuse its discretion if it based its ruling on an erroneous view of the law.'") (quoting *Wash. State Physicians Ins. Exch. & Ass'n v. Fisons Corp.*, 122 Wn.2d 299, 339, 858 P.2d 1054 (1993)).

Hearsay is "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." ER 801(c). Under ER 802, hearsay is not admissible unless provided by court rule or statute. One hearsay exception is

the "state of mind" exception in ER 803(a)(3). ER 803(a)(3) states that a statement is not excluded as hearsay if it is a:

> statement of the declarant's then existing state of mind, emotion, sensation, or physical condition (such as intent, plan, motive, design, mental feeling, pain, and bodily health), but not including a statement of memory or belief to prove the fact remembered or believed unless it relates to the execution, revocation, identification, or terms of declarant's will.

To be admissible under ER 803(a)(3), the declarant's state of mind must be at issue. *State v. Powell*, 126 Wn.2d 244, 893 P.2d 615 (1995) ("[T]he state of mind exception of ER 803(a)(3) is generally only applicable in instances where the state of mind of the deceased is at issue."); *State v. Aaron*, 57 Wn. App. 277, 279-80, 787 P.2d 949 (1990) (holding officer's testimony regarding statement by 911 dispatcher was not admissible to show officer's state of mind in explaining why officer acted the way he did because legality of search, and therefore officer's state of mind, was not at issue).

The District argues that the trial court improperly allowed Stines to testify regarding the statements V.V. made about Shafer's conduct with V.V. and N.L. on the bus. Specifically, Stines testified that V.V. told her that Shafer was her friend and that Shafer scratched the girls' backs, tickled them, let them sit on his lap, and read them knock-knock jokes on his phone. V.V.'s statements were inadmissible hearsay.

As an initial matter, it is important to be clear about the issues before this court regarding Stines' testimony about V.V.'s statements. The first question is whether V.V.'s statements are hearsay at all under ER 801(c). And then, if so, whether the hearsay exception in ER 803(a)(3) permits the admission of V.V.'s statements. These are two distinct inquiries that the majority conflates. V.V.'s statements are hearsay because they were offered for the truth of the matter

asserted. And, her statements are not admissible under the ER 803(a)(3) "state of mind" exception because V.V.'s state of mind is not material to a fact at issue in this case. Accordingly, the trial court erred by allowing Stines to testify to V.V.'s hearsay statements.

First, at trial, Gutierrez asserted that "[n]othing that's being said is being offered for the truth of whether [Shafer] was their friend—" 2 Report of Proceedings (RP) at 208. Based on this assertion Gutierrez was arguing that V.V.'s statements were not hearsay under ER 801(c) because they were being admitted to show that Shafer rode the bus often enough that the District should have been concerned—they were not being offered to prove that Shafer was V.V.'s friend or that he scratched the girls' backs, told them jokes, or let them sit on his lap. However, a nearly identical argument has been considered and rejected by Division One of this court in *Tortes v. King County*, 119 Wn. App. 1, 84 P.3d 252 (2003).

In *Tortes*, the plaintiff was injured in a bus crash that resulted from another bus passenger shooting the bus driver and then shooting himself. 119 Wn. App. at 6. The plaintiff filed a claim alleging that King County was negligent in failing to protect her. *Tortes*, 119 Wn. App. at 6. The reviewing court affirmed the trial court's order granting summary judgment because, although common carriers owe the highest degree of care to their passengers, the criminal act of a third party murdering a bus driver was not reasonably foreseeable. *Tortes*, 119 Wn. App. 7-8. In support of her argument that the criminal acts were reasonably foreseeable, the plaintiff attempted to introduce a newspaper article documenting other criminal incidents on buses. *Tortes*, 119 Wn. App. at 13. The court affirmed the trial court's ruling striking the article explaining:

> Tortes claims she is not attempting to prove that the incidents in the article actually happened, but only that Metro was on notice that such incidents were being alleged and, therefore, the accident and resulting injuries at issue here were foreseeable. We disagree. To be relevant to the case, any incidents providing notice would

necessarily have to have happened. If the incidents actually happened, then the article was submitted for the truth of that fact, and, therefore, the article is certainly hearsay.

*Tortes*, 119 Wn. App. at 14.

The same reasoning applies here. In order to support the assertion that Shafer rode the bus so often that the District should have been alerted to his unusual behavior, V.V.'s statements about her interactions with Shafer would have to be true. Therefore, V.V.'s statements are being offered for the truth of the matter asserted, which is hearsay, and would only be admissible if the state of mind exception in ER 803(a)(3) applies.

Gutierrez argued, and the trial court agreed, that V.V.'s statements were admissible under ER 803(a)(3). As noted above, to be admissible under ER 803(a)(3), the statement must prove the declarant's then existing state of mind *and* the declarant's state of mind must be relevant to a material fact at issue. The majority determines that V.V.'s statements were admissible under ER 803(a)(3) because "friendship" is a state of mind and all of V.V.'s statements are either direct or circumstantial evidence that V.V. believed Shafer was her friend. Majority at 30-31. However, the inquiry under ER 803(a)(3) does not end at determining whether the statement proves the declarant's state of mind. Even assuming that V.V.'s statements do prove her then existing state of mind, V.V.'s state of mind is not material to an issue of fact before the jury.

There were four material issues before the jury: (1) Did the District fail to protect N.L. by failing to have appropriate rules and procedures? (2) Did the District negligently supervise Shafer by allowing him to ride along on midday routes? (3) Did the District negligently train its employees by failing to train the transportation department on boundary invasions? and (4) Were Shafer's criminal acts reasonably foreseeable? V.V.'s state of mind regarding her "friendship" with Shafer

could only conceivably be relevant to whether Shafer's acts were reasonably foreseeable. But the District had no knowledge of V.V.'s state of mind. The District did not know that V.V. believed that Shafer was her friend. V.V. did not make any statements that Shafer was her friend until after N.L. was molested. At best, V.V.'s state of mind could support an inference that Shafer rode the bus numerous times, which in turn could support an inference that the number of times Shafer rode the bus was actually unusual or suspicious, which in turn could support the inference that the District should have known that Shafer posed a risk of harm to children. However, this connection is simply too convoluted and tenuous to render V.V.'s "state of mind" at issue in this case. Therefore, V.V.'s statements were not admissible under ER 803(a)(3), and Stines should not have been permitted to testify to them.

3.      McGoey and Whitehill improperly vouched for the credibility of N.L.'s statement

Although ER 702 allows an expert to offer an opinion on an ultimate issue of material fact, an expert may not usurp the factfinder's responsibility to determine credibility. *Fettig v. Dep't of Soc. & Health Servs.*, 49 Wn. App. 466, 477, 744 P.2d 349 (1987), *review denied*, 110 Wn.2d 1003 (1988); *see also State v. Fitzgerald*, 39 Wn. App. 652, 657, 694 P.2d 1117 (1985) ("'An expert may not go so far as to usurp the exclusive function of the jury to weigh the evidence and determine credibility.'") (quoting 5A KARL B. TEGLAND, WASHINGTON PRACTICE, EVIDENCE LAW AND PRACTICE, § 292, at 39 n.4 (2d ed. 1982)). Moreover, "[a]n expert may not offer an opinion on an ultimate issue of fact when it is based solely on the expert's perception of the witness' truthfulness." *State v. Alexander*, 64 Wn. App. 147, 154, 822 P.2d 1250 (1992).

a. *McGoey's testimony*

The District argues that McGoey improperly vouched for the credibility of N.L.'s statement. McGoey testified:

[GUTIERREZ]: Okay. And so I was asking you what evidence did you see that would—would provide a differing estimation of the number of ride-alongs that Shafer did with [Mario] Paz?
[MCGOEY]: [N.L.] said that Gary Shafer rode 20 times on the bus.
[GUTIERREZ]: We had a chance to look at the video of the interview Detective Stines did with [N.L.], and in that one she said he rode sometimes and he didn't ride other times. Where was the information that you saw about the twenty times?
[MCGOEY]: It was in the report through the psychologist.
[GUTIERREZ]: Okay. All right. And did you draw conclusions at all after weighing the evidence about what the likely amount of time was that Gary Shafer rode along with Mario Paz?
[MCGOEY]: Yes.
[GUTIERREZ]: Tell us about that.
[MCGOEY]: Well, definitely more than three times, two or three times, multiple times. I have to accept the evidence I see on its face, twenty times or—but, you know, definitely more than three times.
[GUTIERREZ]: You could accept the evidence at face value that Mario Paz said which was three times. Was that consistent with what you saw?
[MCGOEY]: No.

4 RP at 672-73.

The majority asserts that the District waived its objection to this testimony because it did not object during McGoey's testimony. I disagree. Under RAP 2.5(a) a party may not generally raise an issue for the first time on appeal. However, this court may exercise its discretion to waive any rule "to serve the ends of justice." RAP 1.2(c). Here, McGoey's testimony regarding the accuracy of N.L.'s statement came immediately after the trial court told the parties that the questioning of the witness would proceed "without further disruption." 4 RP at 671. I do not believe it serves the ends of justice to penalize a party for following a trial court's directive.

Moreover, an expert's opinion vouching for otherwise inadmissible hearsay invades the province of the jury and undermines confidence in the verdict. Accordingly, I would address the merits of the District's claim that McGoey improperly vouched for the credibility of N.L.'s statement.

As noted above, an expert may not offer an opinion that usurps the jury's responsibility to weigh the evidence and determine credibility. *Fettig*, 49 Wn. App. at 477. Here, McGoey specifically testified that he was of the opinion that N.L.'s statement regarding how many times Shafer rode the bus was more credible than Paz's testimony that Shafer rode his bus three times. 4 RP at 672-73. McGoey's opinion clearly usurps the role of the jury. Not only did McGoey offer an opinion on both the credibility of N.L.'s statement and Paz's testimony, but he agreed that he reached his conclusion after "weighing the evidence." 4 RP at 672-73. McGoey's testimony improperly vouched for the credibility of N.L.'s statement. And, by stating that he weighed the evidence, McGoey's testimony gave the impression that N.L.'s statement was actually substantive evidence of how often Shafer rode her bus.

  b.  *Whitehill's Testimony*

I also disagree with the majority that this court should not address the District's argument that Whitehill improperly vouched for the accuracy of N.L.'s statement. The majority asserts that the District waived its objection to Whitehill's testimony asserting that N.L.'s statement was reliable because the District did not object. The original line of questioning regarding the reliability of N.L.'s statement began with a juror's question, asking how reliable information gathered from a five or six year old is. Whitehill offered a generic explanation that the reliability of information varies depending on the child. However, on redirect Gutierrez continued the line of questioning:

[GUTIERREZ]: And in terms of the information that you gathered from [the woman's] interview, was it also similarly reliable?

[WHITEHILL]: It was. It was—you know, she didn't make the disclosures that she'd made to Detective Stines in her interview with [the woman], but in terms of what she provided, you know, we saw that little clip with the twenty where she wrote that down as well, and that seemed to be factually correct information. That is, I didn't have any evidence that it is not.

[GUTIERREZ]: So were the statements that she was making, both from Detective Stines's interview process and in your clinic, were they corroborated by the other evidence?

[DISTRICT]: Objection. Leading.

[THE COURT]: Rephrase.

[GUTIERREZ]: What can you tell us about whether her statements were corroborated by other evidence?

[WHITEHILL]: Well, they seemed to be reliably—reliable. That is, reliability in psychology means kind of repeated measures of the same phenomenon, and to the extent that [N.L.] shared similar information across both interviews, that would be one index of reliability or corroboration.

6 RP at 1046-47. Although the District did not specifically object on the basis of vouching, I would consider the District's argument under RAP 1.2(c). Because an expert opinion on credibility invades the province of the jury, expert testimony vouching for the credibility of an otherwise inadmissible hearsay statement undermines confidence in the jury's verdict. And, considering the significance of N.L.'s statement if the jury did consider it reliable substantive evidence, I believe it serves the end of justice to review the error.

Here, Whitehill testified that he believed N.L.'s statement that Shafer rode her bus 20 times was factually correct. And, when Whitehill answered that N.L.'s statements appeared reliable in response to Gutierrez's question regarding whether N.L.'s statements were corroborated implies to the jury that there is additional information that corroborates N.L.'s statement. This was improper. Whitehill's testimony regarding the reliability of N.L.'s statements was an improper opinion on the credibility of an otherwise inadmissible hearsay statement.

B. HARMLESS ERROR

Although the trial court made several erroneous evidentiary rulings, this court must still determine whether the evidentiary errors require reversal. An erroneous evidentiary ruling requires reversal only when it results in prejudice. *Mut. of Enumclaw Ins. Co. v. Gregg Roofing Inc.*, 178 Wn. App. 702, 728-29, 315 P.3d 1143 (2013) (quoting *Brown v. Spokane County Fire Prot. Dist. No. 1*, 100 Wn.2d 188, 196, 668 P.2d 571 (1983)). Any error that affects the outcome of the case is prejudicial and not harmless. *Mut. of Enumclaw*, 178 Wn. App. at 729 (citing *Brown*, 100 Wn.2d at 196). "'[I]mproper admission of evidence constitutes harmless error if the evidence is cumulative or of only minor significance in reference to the evidence as a whole.'" *Mut. of Enumclaw*, 178 Wn. App. at 729 (quoting *Hoskins v. Reich*, 142 Wn. App. 557, 570, 174 P.3d 1250, *review denied*, 164 Wn.2d 1014 (2008)).[16]

Here, the improperly admitted evidence was prejudicial to the District. The jury was specifically instructed that:

> With regards to the criminal actions of any employee of the District, these actions are reasonably foreseeable only if the District and its employees knew or in the exercise of reasonable care should have known that the employee was a risk to harm a student.

---

[16] Overall, a comparison between my harmless analysis and the majority's harmless error analysis is unhelpful because of the disparity between the evidence the majority believes was improperly admitted and the evidence I believe was improperly admitted. However, I note that the majority relies on its determination that there was sufficient evidence to support the jury's verdict to support its conclusion that the trial court's evidentiary rulings were harmless. The sufficiency of the evidence standard is highly deferential to the jury's verdict and requires examining all the evidence in favor of the prevailing party. *Bland v. Mentor*, 63 Wn.2d 150, 155, 385 P.2d 727 (1963) (When determining the sufficiency of the evidence, this court need only consider the evidence favoring the prevailing party). In contrast, to determine whether an evidentiary error is harmless this court must review the evidence as a whole to attempt to determine what effect, if any, the improperly admitted evidence had on the jury's verdict. *Mut. of Enumclaw*, 178 Wn. App. at 729.

Clerk's Papers at 1095. To meet this burden, Gutierrez argued that if the District was exercising reasonable care it would have noticed that Shafer was abusing the ride-along policy to groom and abuse kindergarten girls. Proving this proposition required Gutierrez to show that Shafer was riding the bus an unusual or suspicious number of times.

As an initial matter, the trial court gave the jury a limiting instruction which stated that the evidence of N.L.'s statement was only admitted for a limited purpose. Although this court presumes that juries follow the trial court's instructions, there are circumstances in which the prejudice cause by the trial court's errors is so significant it cannot be cured by a jury instruction. *Bertsch v. Brewer*, 97 Wn.2d 83, 88, 640 P.2d 711 (1982); *see also In re Pers. Restraint of Glasmann*, 175 Wn.2d 696, 708, 286 P.3d 673 (2012) (no instruction could cure the prosecutor's misconduct because of the "multiple ways in which the prosecutor attempted to improperly sway the jury and the powerful visual medium he employed"). Given the circumstances of this case, I do not believe that a jury instruction can cure the prejudice resulting from the erroneous evidentiary rulings in this case.

N.L.'s statement was the only evidence specifically contradicting Paz's testimony that Shafer only rode his bus three times. And, because McGoey was improperly permitted to offer an opinion on the credibility of N.L.'s statement, it is more likely that the jury believed that they could rely on the statement as substantive evidence. Similarly Whitehill's improper opinion that N.L.'s statement appeared factually correct made it more likely that the jury would disregard the instruction and consider N.L.'s statement as substantive evidence on how many times Shafer rode the bus. More importantly, the trial court not only allowed the video of N.L.'s statement to be shown to the jury, it admitted the video as an independent exhibit. When an improper piece of

evidence is admitted as an independent exhibit that the jury can review during deliberations, it can be "even more noticeable and damaging." *Bertsch*, 97 Wn.2d at 88. And, images and other visual aids are more prejudicial than simple statements. *Glasmann*, 175 Wn.2d at 707-08. Therefore, showing the jury the video of N.L.'s statement and admitting the video as a separate exhibit created a prejudice that could not be cured by a simple jury instruction.[17] The limiting instruction does not resolve whether the evidentiary errors in this case harmless.[18]

Here, the majority of the evidence that Gutierrez relied on to prove that the District should have known that Shafer posed a risk of harm to a child was either inadmissible evidence or inextricably linked to inadmissible evidence. Without N.L.'s statement that Shafer rode her bus 20 times or Gutierrez's testimony regarding N.L.'s other statements, the only direct evidence regarding how often Shafer rode N.L.'s bus was Paz's testimony that Shafer rode along two to three times and N.L.'s interview with Stines in which N.L. stated Shafer rode the bus some days. And, although there was evidence that Shafer rode along with other drivers, with the exception of Dale Thompson's route, he did not ride the same route more than three times. And, Fred Stanley, and Thompson both explained why Shafer would have ridden Thompson's bus with a legitimate

---

[17] Even the majority admits that there was a "potentially increased likelihood that the jury would disregard the court's limiting instruction" by the trial court's erroneous admission of N.L.'s video recorded statements to the psychologist. Majority at 26.

[18] Although N.L.'s statement was admissible to explain Whitehill's opinion, I do not believe that the improper admission of N.L.'s statement in McGoey's testimony, the video, or the vouching was harmless because they were cumulative. If the sole reference to N.L.'s statement was a brief reference to explain Whitehill's opinion on damages, I would agree that the jury would follow the instruction and only consider the statement as a basis to explain Whitehill's opinion on damages. However, given the admission of the statement in McGoey's testimony, the video, and the vouching by both experts, it makes it more likely that the jury would consider the evidence as substantive evidence.

purpose approximately 60 times over the course of 5 years. Moreover, it appears McGoey's unqualified opinion that Shafer's conduct was unusual enough to warrant action by the District was dependent on Shafer riding a particular bus at least 20 times. In my opinion, the improper admission of N.L.'s statements through McGoey, Whitehill, and Gutierrez affected the verdict by providing improper support for Gutierrez's tenuous position the Shafer abused the ride along policy to the extent the District should have known that he posed a risk of harm to children.

Similarly, Stines' testimony regarding V.V.'s statements and Shafer's other convictions was not harmless.[19] V.V.'s feelings toward Shafer, the conduct V.V. stated occurred on the bus, and Shafer's other crimes were not known to anyone, let alone the District, at the time Shafer molested N.L. Allowing Gutierrez to present this evidence to the jury implies that Shafer's unknown conduct could support a finding that the District should have known Shafer posed a risk of harming children.

In my opinion, the improperly admitted evidence in this case affected the jury's verdict. Therefore, I would reverse and remand for a new trial or other proceedings. I respectfully dissent.



Lee, J.

---

[19] The majority did not address the effect of V.V.'s statements because the majority determined that V.V.'s statements were admissible hearsay. However, the majority did state that the improper admission of Shafer's conviction for child pornography was harmless because of the other extensive evidence that cast Shafer in a negative light. The issue is not whether the evidence casts Shafer in a negative light because Shafer was not a defendant. Rather the issue is whether the improperly admitted evidence prejudiced the District by allowing or encouraging the jury to reach a verdict on improper or unsupported grounds. Although the light in which Shafer is cast may have some effect, the more prejudicial effect of the evidence results from the implication that Shafer's possession of child pornography, conduct which did not come to light until after N.L. was molested, could put the District on notice that Shafer posed a risk of harm to children.